Complaint of CONSOLIDATED MA-CHINES, INC., for Exoneration from or Limitation of Liability as owner of the FISHING VESSEL NOVELTY, Official No. 249926, Third-Party Plaintiff,

v.

PROTEIN PRODUCTS CORPORATION, Third-Party Defendant.

No. 69–1 Civ. T.

United States District Court,
M. D. Florida,
Tampa Division.

Findings of Fact and Conclusions of Law March 27, 1972.

Amended Findings of Fact and Conclusions of Law March 30, 1972.

Dec. 16, 1976.

**214**

Dewey R. Villareal, Jr., of Fowler, White, Gillen, Boggs, Villareal & Banker, Tampa, Fla., for Consolidated Machines, Inc.

C. J. Hardee, Jr., Tampa, Fla., Morrow Bennett, of Hamilton, Douglas & Bennett, P. A., Tampa, Fla., David B. Kaplan, Kaplan, Latti & Flannery, Boston, Mass., for claimants Francis L. Winter, Joseph K. Winter, Kenneth Smith, Stephen Richmond and Francis D. Webb.

Alderman, Johnston, Pack & Kluttz, Fort Myers, Fla., for personal representative of estate of Kenneth Smith, deceased.

Brooks P. Hoyt, of Macfarlane, Ferguson, Allison & Kelly, Tampa, for Protein Products Corp.

WILLSON, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case comes before the Court in a Petition for Limitation of, or Exoneration from Liability filed by Consolidated Machines, Inc. Seven persons, i. e., James C. Johnston, as Personal Representative of five estates, those of Joseph K. Winter, Francis L. Winter, Francis Webb, Kenneth Smith and Stephen Richmond, on behalf of the statutory beneficiaries of such decedents, and Lawrence Finley and Clyde Parrish, the latter two of whom claim personal injuries as a result of a casualty which occurred on August 11, 1968, filed claims in the limitation proceeding. Damages for death are claimed on behalf of the beneficiaries of the decedents, under the Jones Act and under General Maritime Law for Stephen Richmond, and under the General Maritime Law for negligence and unseaworthiness on behalf of the other decedents. Damages for personal injuries are claimed by Parrish under the Jones Act and General Maritime Law and by Finley under the General Maritime Law for both negligence and unseaworthiness. The parties have previously agreed and the Court has ruled that the issues for determination in this phase of this case are limited to the liability issues, and the damages, if any, will be determined in a later proceeding to be set by the Court.

## FINDINGS OF FACT

1. On August 11, 1968, Stephen Richmond was an assistant engineer, a member of the crew of the Fishing Vessel NOVELTY and Clyde Parrish was a cook, a member of the crew of the same vessel. Joseph K. Winter, Francis L. Winter, Kenneth

Smith, Francis Webb and Lawrence Finley were employees of Protein Products Corporation and at the time in question in this case were engaged in the capacity of longshoremen unloading a cargo of fish from the F/V NOVELTY.

2. Consolidated Machines, Inc. is a successor to Dan B. Vincent Inc. The Dan B. Vincent Company had been engaged in Tampa, Florida, since 1946, in the design and manufacture of food processing machinery, primarily citrus processing. This company was a family owned company. Dan B. Vincent was President, his son Daniel A. (Ashley) Vincent was Vice President and Mrs. Dan B. Vincent was Secretary-Treasurer. In March, 1968, the Dan B. Vincent Company sold its name and certain patent rights to an out-of-state corporation and changed its name and continued to operate under the name Consolidated Machines, Inc. with the same officers.

3. In 1965 or 1966, Daniel A. Vincent (who will hereafter be referred to as Ashley Vincent), Richard T. Agster, Charles B. Davies and David Kalashian, formulated a plan to build a fishmeal reduction plant on the west coast of Florida. The purpose of this plant was to catch so-called "trash" fish, such as menhaden minnows and thread herring minnows, and convert these fish through a manufacturing reduction process into dry meal of a high protein quality for animal and poultry feed. A number of such plants exist throughout the United States and several are located on the Gulf Coast and on the eastern seaboard.

4. Ashley Vincent, Vice President of Dan B. Vincent, Inc., later Consolidated Machines, inc., is a graduate engineer having graduated from the Georgia Institute of Technology, commonly known as Georgia Tech, in the early 1950's and having worked and been an officer in the Dan B. Vincent Company or Consolidated Machines since that time. His knowledge of fishmeal plants was limited to having visited two fishmeal plants during the course of the 1950's and early 1960's, installing machinery manufactured by the Dan B. Vincent Company in these plants.

5. Richard T. Agster is President of Petroleum Packers, Inc. and is an amateur pilot. He had no knowledge of the fishmeal processing industry.

6. Charles B. Davies attended Muhlenberg University for two years but did not graduate, was an insurance claims adjuster and then in sales and promotion work, and owned a small plastic factory for a short time in the Tampa area. His knowledge of the fishmeal rendering industry was limited to visiting a couple of plants during the preliminary stages of the design and construction of the Protein Products plant.

7. David Kalashian attended one semester at the University of Florida and then went to work as an apprentice in a blacksmith shop and then in a general welding and repair shop, and subsequently from about 1957 to 1967 worked for the Dan B. Vincent Company manufacturing primarily citrus processing machinery but on three occasions he helped in the installation of machinery for fishmeal plants located in Florida, Mississippi and Wisconsin.

8. Richard T. Agster became president of Protein Products Corporation. Ashley Vincent and David Kalashian were Vice Presidents of the company and Charles B. Davies was Secretary-Treasurer and Plant Manager from the date of the incorporation of the plant until sometime in the Spring of 1968. During this entire period Ashley Vincent was also Vice President of the Dan B. Vincent Company. Except for the degree in general engineering held by Ashley Vincent, none of the four officers had any education or training in architecture, engineering, chemistry or biology. When they decided to build a fishmeal plant in 1956 they did not employ an architect or an engineer (with the exception of Ashley Vincent), a chemist or biologist for the purpose of assisting with the design of such a plant. Neither did they employ any of the above or a general contractor to assist in the construction of the plant. Mr. Ashley Vincent of the Dan B. Vincent Company designed the plant, prepared the plans and specifications and that company manufactured most of the production line machin-

ery, although some of the equipment was fabricated elsewhere or purchased from other concerns. Mr. Vincent, Mr. Kalashian and Mr. Davies supervised the construction of the plant and the production line. Portions of the construction were sub-contracted to sub-contractors such as the construction of the steel building which housed the main plant, construction of the dock, digging of a channel to the dock, etc. Other construction, such as the setting up of the production line was done by plant employees. At the time the plant was placed in operation on October 15, 1967, neither Protein Products nor its originators had consulted with any engineers other than Ashley Vincent, any architects, any chemists or biologists. (When the plant ran into a problem with the Air and Water Pollution Control Division of the State Board of Health of the State of Florida, Protein Products did retain the services of a professional engineer in Gainesville, Florida, to clear the plans from the standpoint of air pollution with the State Board of Health. This engineer, Dr. Harding, did not contribute to the design nor to the supervisions of construction of the plant.)

9. The manner in which the fishmeal rendering process was designed to operate was as follows: A mother slip (fishing vessel) with several purse boats with nets, would go out from the dock located at the plant site and through Charlotte Harbor into the Gulf of Mexico. This boat would search for "trash" fish, either menhaden minnows or thread herring minnows. Schools of these fish were spotted by an airplane flown by a pilot who was employed by Protein Products. When the airplane spotted the school of fish, it directed the mother vessel to the fish by radio and then directed the fishing operation. The fisherman would then leave the mother vessel and get into the purse boats and circle the school of fish with a purse seine net. After the school of fish had been circled, a line would be pulled taut which would close the bottom of the net, thus placing the school of fish in a cup. The net would then be drawn together tighter making a consolidated mass of fish.

The mother vessel would then come up to the net, place a large hose into the fish mass and pump the fish mass and water into the cargo holds of the vessel which were refrigerated. When the vessel had completed its catch, it would return to the dock of the Protein Products plant. The fishing was done within an area between the Gulf Coast and 4 miles offshore and 60 miles off the entrance of Charlotte Harbor north and south. Although the vessel was never far from its home dock, it did occasionally stay out overnight. Sleeping and cooking facilities were available aboard the vessel and the crew did cook and eat meals aboard the vessel when she was engaged in fishing.

10. After the vessel returned to its dock, there was in each cargo hold a large pipe called a stand pipe which went through the deck into the hold within a few inches of the bottom of the hold. An 8 to 10 inch flexible line was connected to this stand pipe from the dock. This flexible line in turn was connected to a 10 inch line which ran approximately 300 feet to a scalper tank adjacent to the fishmeal plant. A pump on the dock pumped the fish mass into the scalper tank where the fish were separated from the water and the water was allowed to fall into a holding tank. The fish were then counted by an automatic counter and run through the plant where they were pressed and then cooked. The cooked fish resulted in fishmeal. Oil in the water that was pressed out of the fish was separated and was used as a by-product of the plant's operation. The water in turn was returned to the holding tank. All cleanup water used in the plant was placed in the holding tank. The water in the holding tank was recirculated, that is, it was returned by way of a 6 inch line which ran partially underground and partially above ground back to connections at the end of the dock. Smaller lines were attached to these connections and were used to spray the recirculated water into the hold of the vessel to liquify the fish mass that was being pumped out by the 10 inch line. The design procedures required this

recirculated water, when it contained a quantity of fish solubles, to be run through an evaporator in the plant and completely evaporated. The plant was designed so that no effluent or waste water would be discharged from the plant.

11. After the plant was placed in operation, the recirculated water, which contained fish solubles, was not always evaporated. During the first few months of operation, this recirculated water which contained a substantial amount of fish solubles and scales, was flushed out of the line and the tank between operation and replaced by fresh seawater by placing the end of the 10 inch line into the waters of Charlotte Harbor adjacent to the dock. Sometime prior to August 11, 1968, upon complaints of other fishermen in the area, an inspector of the Lee County Health Department ordered Mr. C. B. Davies, the plant manager, to stop discharging this effluent into the waters of Charlotte Harbor. After this warning, the plant did not flush or clean out the lines by flushing them out with fresh sea water, but on one or two occasions did discharge the effluent onto barges and took it out some distance into the Gulf of Mexico and disbursed it into the waters of the Gulf.

12. On August 11, 1968, the recirculated water in the tanks and the lines was dirty and full of fish solubles and fish scales. The lines and tanks had not been flushed out for at least 7 days and the water in the lines, exposed to the direct rays of the sun, had been allowed to cook in the summer heat. The temperatures ranged as high as 94° Fahrenheit during this period. The necessary heat, anerobic conditions and chemicals were present in the lines to produce highly lethal quantities of hydrogen sulphide gas, a gas that is equally as toxic as hydrogen cyanide, formally used in the death chambers of California.

13. Hydrogen sulphide gas is commonly produced by the deterioration or rotting of protein products or organic matter. The most common example of hydrogen sulphide is that produced by a rotten egg. It is the hydrogen sulphide that gives the rotten egg its unpleasant odor. Hydrogen sulphide is considered dangerous in concentrations between 10 and 20 parts per million.

14. The plans and specifications of the Protein Products plant required approval by the Florida State Board of Health and the local Lee County Health Department prior to construction and operation of the plant. Plans were approved upon the representation of Protein Products Corporation that the water pollution regulations of the Florida Administrative Code, 170–C5, were not applicable in that the plant would produce no liquid discharge other than normal sewage from toilets and lavatories which would be handled by approved septic tanks. The following conditions were also imposed by the State Board of Health, among others: (1) That approval was given with the understanding that upon the installation of the works its operation should be placed under the care of a competent person whose qualifications were approved by the State Board of Health and the operation should be carried out according to best accepted practices and in accordance with the recommendations of the State Board of Health; (2) That the engineer of record on the application, Dr. Harding, should be responsible for the supervision of the construction of the project and upon completion should inspect the project for complete conformity to the plans and specifications and submit a written report of such inspection to the interested County Health Department and to the Florida State Board of Health; and (3) That satisfactory safety devices should be provided.

15. United States Department of Labor, Safety and Health Regulations for Longshoring, Section 1504.93(c)(d) and (e), provide that before employees are permitted to enter or work in stowage spaces in which there is a possibility of oxygen deficiency, or in which explosive, poisonous, noxious or gaseous cargos have been carried or are stowed, the employer must first ascertain from the officer in charge of the vessel the conditions of the place of work with respect to atmospheric contaminants, and when it is ascertained that the atmosphere in which the employees would be working is immedi-

ately dangerous to life or the atmosphere becomes immediately dangerous to life, no employees shall be permitted to enter or remain in the work place until the condition has been made safe. The regulations further provide that when it is ascertained that the atmosphere in which employees would be working would contain gaseous contaminants not immediately dangerous to life, or if it becomes so contaminated during cargo handling operations, no employee shall be permitted to enter or remain in the work place until the atmosphere is made safe or the employees are protected by suitable respiratory protective equipment in accordance with the requirements of Section 1504.102(a) and (b).

16. It is commonly known by chemists and biologists and by students taking these courses in college and by many laymen that deterioration of protein products and organic matter commonly produces hydrogen sulphide gas and that such gas in sufficient concentration is highly lethal. When fish scales and fish solubles in salt water are allowed to rot for several days in the hot sun in mid August, it should be a matter of common knowledge that such condition would probably produce hydrogen sulphide gas in dangerous concentrations if the water and solids are contained in an enclosed space. Hydrogen sulphide gas kills human beings by paralyzing the central nervous system. It is breathed through the nose and the first nerve that is paralyzed is the olfractory nerve so that the higher the concentration, the less likely that the victim will smell the gas and have any warning. Hydrogen sulphide gas will remain in its pure state for an indefinite period. This gas is known to constitute an extreme hazard in coal mining operations and hydrogen sulphide detecting equipment is required by regulations of the United States Bureau of Mines in all coal mining operations. The gas sometimes encountered in coal mining operations was produced millions of years ago by the deterioration of organic matter such as dinosaurs and remained in high concentration within the earth having no way of escape from the pocket in which it was first formed.

17. On the morning of August 11, 1968, employees of the Protein Products plant and some of the crew members of the fishing vessel NOVELTY, which had come to the plant with a catch of minnows for discharge at the plant, prepared to unload the vessel. Two of the plant employees were in the hold of the vessel preparing to push the fish cargo toward the stand pipe for pumping out of the vessel. Within seconds after the pumps were started and water was run into the hold from the 6 inch line, previously described, these two employees fell over onto the mass of fish. A great deal of excitement ensued and in the attempt to rescue these two men, four other employees of either the vessel or the plant fell into the hold. One, Lawrence Finley, was rescued by means of a hook which was used to pull him out. The five decedents died in the hold. One of the decedents, Stephen Richmond, leaned over the hold to see what was going on and was overcome by the gas coming from the hold and fell into the hold on top of the other employees. Two of the employees, including the vessel's cook Clyde Parrish, got a whiff of the gas coming from the hold and fell backward on the deck. These two employees survived.

18. The cause of the deaths of claimant's decedents and the injuries suffered by Parrish and Finley was the injection into the vessel's cargo hold of lethal quantities of hydrogen sulphide gas which had formed in pockets in the recirculation lines while the lines contained sea water and fish solubles over a period of several days or weeks prior to August 11, 1968. A sample of the water scooped from the hold approximately two hours after the disaster contained more than 500 parts per million of hydrogen sulphide gas and it is probable that the hold contained hydrogen sulphide gas in quantities in excess of 1,000 parts per million at the time that the gas was first injected into the hold. No safety regulations had been promulgated by either Protein Products Corporation or Consolidated Machines, Inc.,

or its predecessor Dan B. Vincent, Inc., from the time the plant commenced operation to the date of the disaster. No safety programs had been initiated by either company. The only sanitary regulation adopted was a sign in the wash room that required employees to wash their hands before entering the plant. A kit, containing a small device for the detection of hydrogen sulphide and allowing the individual user to determine the concentration of the gas, was readily available in the area at a cost of approximately $66 per kit. Neither the plant nor vessel had acquired any hydrogen sulphide detection kits nor did they acquire or have on hand any respiratory equipment.

The original plant manager, Charles B. Davies, resigned as plant manager in about April, 1968. He was replaced by David Kalashian. David Kalashian took the job of production manager sometime prior to the time of the accident and the responsibility for plant management at the date of the accident is not clear. The company had had several changes in management. Certainly the management at the time of the accident was not properly trained and equipped by Protein Products Corporation to competently manage the plant and to adopt and promulgate proper safety procedures as required by the Florida State Board of Health.

Neither the officers of Dan B. Vincent, Inc. or its successor, Consolidated Machines, Inc., during the design phase of the plant, nor the officers of Protein Products Corporation during the construction and operational phase of the plant made any competent or substantial inquiry to determine the risks or hazards inherent in the fishmeal rendering process or to determine the extent or concentration that hydrogen sulphide gas would be produced from the rotting of fish under conditions such as existed at the time of the accident and for several days prior thereto.

## CONCLUSIONS OF LAW

1. Protein Products Corporation as the designer of the Protein Products plant and as the owner and operator of said plant had a duty to inquire of experts into the risks and hazards inherent in a fishmeal rendering process and in particular into the risks and hazards which might be incurred by the rotting and deterioration of fish solubles in water, particularly salt water. This it failed to do.

2. The knowledge of Daniel A. (Ashley) Vincent, one of the designers and engineers of the Protein Products plant is the knowledge of Consolidated Machines, Inc., petitioner herein. His said knowledge as a Vice-President of Protein Products Corporation is imputed to Consolidated Machines, Inc. His failure to inquire and to learn what should have been learned of the hazards of the formation of hydrogen sulphide gas by the rotting of fish at the Protein Products plant under the conditions that prevailed on August 11, 1968 is imputed to Consolidated Machines, Inc. and limitation of liability is denied. Limitation must be denied on the additional ground that the vessel was docked at her home port and her owner, therefore, had the means of knowledge of the facts which caused the deaths and personal injuries here involved.

3. The cargo hold of the F/V NOVELTY in which the five claimants' decedents died and Finley and Parrish suffered personal injury was unseaworthy at the time of the disaster by reason of the fact that it contained hydrogen sulphide gas in rapidly lethal quantities, the inhalation of which by claimants' decedents and the personal injury claimants caused the deaths and injuries complained of. These deaths and injuries were suffered as a result of an unseaworthy condition of the hold of said vessel. This unseaworthy condition was caused by the activation of unseaworthy equipment, i. e., an unseaworthy recirculation hose attached to the vessel by Protein Products. Since the duty to furnish a seaworthy vessel is absolute and nondelegable, Consolidated Machines, Inc. is liable for the ensuing unseaworthy condition of the hold of the F/V NOVELTY and for the deaths and personal injuries resulting therefrom.

4. Petitioner, Consolidated Machines, Inc. is also liable for the deaths and injuries

complained of herein by reason of its negligence in allowing the defectively designed production line to be connected to its vessel at the Protein Products plant when, in the exercise of due care, it should have known of the said defective design and the defective procedure used in the operation of said production line, which negligence proximately contributed to the deaths and personal injuries complained of.

5. Protein Products Corporation is guilty of failure to use due care in the design, construction and operation of its plant and of failure to warn claimants of the conditions prevailing on August 11, 1968 which failure to use due care and to warn proximately resulted in the deaths and personal injuries complained of.

6. Protein Products Corporation warranted to Petitioner Consolidated Machines, Inc. that it would perform its services in a workmanlike manner in unloading the F/V NOVELTY and breached this warranty and shall indemnify Consolidated Machines, Inc. for the damages resulting to Consolidated Machines, Inc. from the deaths of the four employees of Protein Products Corporation and from the injuries sustained by the surviving employee of Protein Products Corporation and for Consolidated Machines, Inc.'s attorney fees and expenses resulting from the defense of said claims.

7. Petitioner Consolidated Machines, Inc. and Protein Products Corporation are jointly and severally liable for the damages resulting from the death of crewman Stephen Richmond of the F/V NOVELTY and for the damages sustained by Clyde Parrish, the surviving crewman of the F/V NOVELTY. The damages resulting from the death of crewman Stephen Richmond and from the injuries sustained by crewman Clyde Parrish shall be borne equally by Consolidated Machines, Inc. and Protein Products Corporation.

8. Consolidated Machines, Inc. and Protein Products Corporation violated the provisions of Section 1504.93(c)(d) and (e), United States Department of Labor, Safety and Health Regulations for Longshoring, and have failed to carry their burden of proof that such violations not only did not but could not have caused the deaths and personal injuries complained of.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case comes before the Court in a Petition for Limitation of or Exoneration from Liability filed by Consolidated Machines, Inc. Seven persons, i. e., James C. Johnston, as Personal Representative of five states, those of Joseph K. Winter, Francis L. Winter, Francis Webb, Kenneth Smith and Stephen Richmond, on behalf of the statutory beneficiaries of such decedents, and Lawrence Finley and Clyde Parrish, the latter two of whom claim personal injuries as a result of a casualty which occurred on August 11, 1968, filed claims in the limitation proceeding. Damages for death are claimed on behalf of the beneficiaries of the decedents, under the Jones Act and under General Maritime Law for Stephen Richmond, and under the General Maritime Law for negligence and unseaworthiness on behalf of the other decedents. Damages for personal injuries are claimed by Parrish under the Jones Act and General Maritime Law and by Finley under the General Maritime Law for both negligence and unseaworthiness. The parties have previously agreed and the Court has ruled that the issues for determination in this phase of this case are limited to the liability issues, and the damages, if any, will be determined in a later proceeding to be set by the Court.

## FINDINGS OF FACT

1. On August 11, 1968, Stephen Richmond was an assistant engineer, a member of the crew of the Fishing Vessel NOVELTY and Clyde Parrish was a cook, a member of the crew of the same vessel. Joseph K. Winter, Francis L. Winter, Kenneth Smith, Francis Webb and Lawrence Finley were employees of Protein Products Corporation and at the time in question in this case were engaged in the capacity of longshoremen unloading a cargo of fish from the F/V NOVELTY.

2. Consolidated Machines, Inc. is a successor to Dan B. Vincent, Inc. The Dan B. Vincent Company had been engaged in Tampa, Florida, since 1946, in the design and manufacture of food processing machinery, primarily citrus processing. This company was a family owned company. Dan B. Vincent was President, his son Daniel A. (Ashley) Vincent was Vice President and Mrs. Dan B. Vincent was Secretary-Treasurer. In March, 1968, the Dan B. Vincent Company sold its name and certain patent rights to an out-of-state corporation and changed its name and continued to operate under the name of Consolidated Machines, Inc. with the same officers.

3. In 1965 or 1966, Daniel A. Vincent, (who will hereafter be referred to as Ashley Vincent), Richard T. Agster, Charles B. Davies and David Kalashian, formulated a plan to build a fishmeal reduction plant on the west coast of Florida. The purpose of this plant was to catch so-called "trash" fish, such as menhaden minnows and thread herring minnows, and convert these fish through a manufacturing reduction process into dry meal of high protein quality for animal and poultry feed. A number of such plants exist throughout the United States and several are located on the Gulf Coast and on the eastern seaboard.

4. Ashley Vincent, Vice President of Dan B. Vincent, Inc., later Consolidated Machines, Inc., is a graduate engineer having graduated from the Georgia Institute of Technology, commonly known as Georgia Tech, in the early 1950's and having worked and been an officer in the Dan B. Vincent Company or Consolidated Machines since that time. He had supervised the installation of machinery manufactured by the Dan B. Vincent Company in several fishmeal plants in the 1950's and early 1960's.

5. Richard T. Agster is President of Petroleum Packers, Inc. and is an amateur pilot. He had no knowledge of the fishmeal processing industry.

6. Charles B. Davies attended Muhlenberg University for two years but did not graduate, was an insurance claims adjuster and then in sales and promotion work, and owned a small plastic factory for a short time in the Tampa area. His knowledge of the fishmeal rendering industry was limited to visiting a couple of plants during the preliminary stages of the design and construction of the Protein Products plant.

7. David Kalashian attended one semester at the University of Florida and then went to work as an apprentice in a blacksmith shop and then in a general welding and repair shop, and subsequently from about 1957 to 1967 worked for the Dan B. Vincent Company manufacturing primarily citrus processing machinery but on three occasions he helped in the installation of machinery for fishmeal plants located in Florida, Mississippi and Wisconsin.

8. Richard T. Agster became president of Protein Products Corporation. Ashley Vincent and David Kalashian were Vice Presidents of the company and Charles B. Davies was Secretary-Treasurer and Plant Manager from the date of the incorporation of the plant until sometime in the Spring of 1968. During this entire period Ashley Vincent was also Vice President of the Dan B. Vincent Company. Except for the degree in general engineering held by Ashley Vincent, none of the four officers had any education or training in architecture, engineering, chemistry or biology. When they decided to build a fishmeal plant in 1956 they did not employ an architect or an engineer (with the exception of Ashley Vincent), a chemist or biologist for the purpose of assisting with the design of such a plant. Neither did they employ any of the above or a general contractor to assist in the construction of the plant. Mr. Ashley Vincent of the Dan B. Vincent Company designed the plant, prepared the plans and specifications and that company manufactured most of the production line machinery, although some of the equipment was fabricated elsewhere or purchased from other concerns. Mr. Vincent, Mr. Kalashian and Mr. Davies supervised the construction of the plant and the production line. Portions of the construction were sub-contracted to sub-contractors such as the construc-

tion of the steel building which housed the main plant, construction of the dock, digging of a channel to the dock, etc. Other construction, such as the setting up of the production line was done by plant employees. At the time the plant was placed in operation on October 15, 1967, neither Protein Products nor its originators had consulted with any engineers other than Ashley Vincent, any architects, any chemists or biologists. (When the plant ran into a problem with the Air and Water Pollution Control Division of the State Board of Health of the State of Florida, Protein Products did retain the services of a professional engineer in Gainesville, Florida, to clear the plans from the standpoint of air pollution with the State Board of Health. This engineer, Dr. Harding, did not contribute to the design nor to the supervision of construction of the plant.)

9. The manner in which the fishmeal rendering process was designed to operate was as follows: A mother ship (fishing vessel) with several purse boats with nets, would go out from the dock located at the plant site and through Charlotte Harbor into the Gulf of Mexico. This boat would search for "trash" fish, either menhaden minnows or thread herring minnows. Schools of these fish were spotted by an airplane flown by a pilot who was employed by Protein Products. When the airplane spotted the school of fish, it directed the mother vessel to the fish by radio and then directed the fishing operation. The fishermen would then leave the mother vessel and get into the purse boats and circle the school of fish with a purse seine net. After the school of fish had been circled, a line would be pulled taut which would close the bottom of the net, thus placing the school of fish in a cup. The net would then be drawn together tighter making a consolidated mass of fish. The mother vessel would then come up to the net, place a large hose into the fish mass and pump the fish mass and water into the cargo holds of the vessel which were refrigerated. When the vessel had completed its catch, it would return to the dock of the Protein Products plant. The fishing was done within an area between the Gulf Coast and four miles offshore and sixty miles of the entrance of Charlotte Harbor north and south. Although the vessel was never far from its home dock, it did occasionally stay out overnight. Sleeping and cooking facilities were available aboard the vessel and the crew did cook and eat meals aboard the vessel when she was engaged in fishing.

10. After the vessel returned to its dock, there was in each cargo hold a large pipe called a stand pipe which went through the deck into the hold within a few inches of the bottom of the hold. An 8 to 10 inch flexible line was connected to this stand pipe from the dock. This flexible line in turn was connected to a 10 inch line which ran approximately 300 feet to a scalper tank adjacent to the fishmeal plant. A pump on the dock pumped the fish mass into the scalper tank where the fish were separated from the water and the water was allowed to fall into a holding tank. The fish were then counted by an automatic counter and run through the plant where they were pressed and then cooked. The cooked fish resulted in fishmeal. Oil in the water that was pressed out of the fish was separated and was used as a by-product of the plant's operation. The water in turn was returned to the holding tank. All cleanup water used in the plant was placed in the holding tank. The water in the holding tank was recirculated, that is, it was returned by way of a 6 inch line which ran partially underground and partially above ground back to connections at the end of the dock. Smaller lines were attached to these connections and were used to spray the recirculated water into the hold of the vessel to liquify the fish mass that was being pumped out by the 10 inch line. The design procedures required this recirculated water, when it contained a quantity of fish solubles, to be run through an evaporator in the plant and completely evaporated. The plant was designed so that no effluent or waste water would be discharged from the plant.

11. After the plant was placed in operation, the recirculated water, which con-

tained fish solubles, was not always evaporated. During the first few months of operation, this recirculated water which contained a substantial amount of fish solubles and scales, was flushed out of the line and the tank between operations and replaced by fresh seawater by placing the end of the 10 inch line into the waters of Charlotte Harbor adjacent to the dock. About May 24, 1968, upon complaints of other fishermen in the area, an inspector of the Lee County Health Department ordered the plant manager to stop discharging this effluent into the waters of Charlotte Harbor. After this warning, the plant did not flush or clean out the lines by flushing them out with fresh sea water, but on one or two occasions did discharge the effluent onto barges and took it out some distance into the Gulf of Mexico and disbursed it into the waters of the Gulf.

12. On August 11, 1968, the recirculated water in the tanks and the lines was dirty and full of fish solubles and fish scales. The lines and tanks had not been flushed out for at least 8 days and the water in the lines, exposed to the direct rays of the sun, had been allowed to cook in the summer heat. The temperatures ranged as high as 94° Fahrenheit during this period. The necessary heat, anerobic conditions, chemicals and bacteria were present in the lines to produce highly lethal quantities of hydrogen sulphide gas, a gas that is equally as toxic as hydrogen cyanide, formally used in the death chambers of California.

13. Hydrogen Sulphide gas is commonly produced by the deterioration or rotting of protein products or organic matter. The most common example of hydrogen sulphide is that produced by a rotten egg. It is the hydrogen sulphide that gives the rotten egg its unpleasant odor. Hydrogen sulphide is considered dangerous in concentrations above 20 parts per million.

14. The plans and specifications of the Protein Products plant required approval by the Florida State Board of Health and the local Lee County Health Department prior to construction and operation of the plant. Plans were approved upon the representation of Protein Products Corporation that the water pollution regulations of the Florida Administrative Code, 170–C5, were not applicable in that the plant would produce no liquid discharge other than normal sewage from toilets and lavatories which would be handed by approved septic tanks. The following conditions were also imposed by the State Board of Health, among others: (1) That approval was given with the understanding that upon the installation of the works its operation should be placed under the care of a competent person whose qualifications were approved by the State Board of Health and the operation should be carried out according to best accepted practices and in accordance with the recommendations of the State Board of Health; (2) That the engineer of record on the application, Dr. Harding, should be responsible for the supervision of the construction of the project and upon completion should inspect the project for complete conformity to the plans and specifications and submit a written report of such inspection to the interested County Health Department and to the Florida State Board of Health; and (3) That satisfactory safety devices should be provided. None of these conditions were complied with.

15. United States Department of Labor, Safety and Health Regulations for Longshoring, Section 1504.93(c)(d) and (e), provide that before employees are permitted to enter or work in stowage spaces in which there is a possibility of oxygen deficiency, or in which explosive, poisonous, noxious or gaseous cargoes have been carried or are stowed, the employer must first ascertain from the officer in charge of the vessel the conditions of the place of work with respect to atmospheric contaminance, and when it is ascertained that the atmosphere in which the employees would be working is immediately dangerous to life or the atmosphere becomes immediately dangerous to life, no employees shall be permitted to enter or remain in the work place until the condition has been made safe. The regulations further provide that when it is ascertained that the atmosphere in which employees

would be working would contain gaseous contaminants not immediately dangerous to life, or if it becomes so contaminated during cargo handling operations, no employee shall be permitted to enter or remain in the work place until the atmosphere is made safe or the employees are protected by suitable respiratory protective equipment in accordance with the requirements of Section 1504.102(a) and (b), United States Department of Labor, Safety and Health Regulations for Longshoring..

16. It is commonly known by chemists and biologists and by students taking these courses in college and by many laymen that deterioration of protein products and organic matter commonly produces hydrogen sulphide gas and that such gas in sufficient concentration is highly lethal. When fish scales and fish solubles in salt water are allowed to rot for several days in the hot sun in mid August, it should be a matter of common knowledge that such condition would probably produce hydrogen sulphide gas in dangerous concentrations if the water and solids are contained in an enclosed space. Hydrogen sulphide gas kills human beings by paralyzing the central nervous system. It is breathed through the nose and the first nerve that is paralyzed is the olfactory nerve so that the higher the concentration, the less likely that the victim will smell the gas and have any warning. Hydrogen sulphide gas will remain in its pure state for an indefinite period.

17. On the morning of August 11, 1968, employees of the Protein Products plant and some of the crew members of the Fishing Vessel NOVELTY, which had come to the plant with a catch of minnows for discharge at the plant, prepared to unload the vessel. Two of the plant employees were in the hold of the vessel preparing to push the fish cargo toward the stand pipe for pumping out of the vessel. Within seconds after the pumps were started and water was run into the hold from the 6 inch line, previously described, these two employees fell over onto the mass of fish. A great deal of excitement ensued and in the attempt to rescue these two men, four other employees of either the vessel or the plant fell into the hold. One, Lawrence Finley, was rescued by means of a hook which was used to pull him out. The five decedents died in the hold. One of the decedents, Stephen Richmond, leaned over the hold to see what was going on and was overcome by the gas coming from the hold and fell into the hold on top of the other employees. Two of the employees, including the vessel's cook Clyde Parrish, got a whiff of the gas coming from the hold and fell backward on the deck. These two employees survived.

18. The cause of the deaths of claimant's decedents and the injuries suffered by Parrish and Finley was the injection into the vessel's cargo hold of lethal quantities of hydrogen sulphide gas which had formed in the recirculation lines while the lines contained sea water and fish solubles over a period of several days or weeks prior to August 11, 1968. A sample of the water scooped from the hold approximately two hours after the disaster contained more than 500 parts per million of hydrogen sulphide gas and it is probable that the hold contained hydrogen sulphide gas in quantities in excess of 1,000 parts per million at the time that the gas was first injected into the hold. No safety regulations had been promulgated by either Protein Products Corporation or Consolidated Machines, Inc., or its predecessor Dan B. Vincent, Inc., from the time the plant commenced operation to the date of the disaster. No safety programs had been initiated by either company. A kit, containing a small device for the detection of hydrogen sulphide and allowing the individual user to determine the concentration of the gas, was readily available in the area at a cost of approximately $66 per kit. Neither the plant nor vessel had acquired any hydrogen sulphide detection kits nor did they acquire or have on hand any respiratory equipment.

The original plant manager, Charles B. Davies, resigned as plant manager in about April, 1968. He was replaced by David Kalashian. Kalashian took the job of production manager sometime prior to the time of the accident and the responsibility for

plant management at the date of the accident is not clear. The company had had several changes in management. Certainly, the management at the time of the accident was not properly trained and equipped by Protein Products Corporation to competently manage the plant and to adopt and promulgate proper safety procedures as required by the Florida State Board of Health.

Neither the officers of Dan B. Vincent, Inc. or its successor, Consolidated Machines, Inc., during the design phase of the plant, nor the officers of Protein Products Corporation during the construction and operational phase of the plant made any competent or substantial inquiry to determine the risks or hazards inherent in the fishmeal rendering process or to determine the extent or concentration that hydrogen sulphide gas would be produced from the rotting of fish under conditions such as existed at the time of the accident and for several days prior thereto.

## CONCLUSIONS OF LAW

1. Dan B. Vincent, Inc., the predecessor to petitioner Consolidated Machines, Inc., as the designer of the Protein Products plant, and Protein Products Corporation, the owner and operator of the Protein Products plant, had a duty to inquire of competent and substantial experts into the risks and hazards inherent in a fishmeal rendering process and in particular into the risks and hazards which might be incurred by the rotting and deterioration of fish solubles in water, particularly salt water. This they failed to do.

2. The knowledge of Daniel A. (Ashley) Vincent, the designer and engineer of the Protein Products plant is the knowledge of Consolidated Machines, Inc. His knowledge as Vice President of Protein Products Corporation is also imputed to Consolidated Machines, Inc. His failure to inquire and to learn what should have been learned of the hazards of the formation of hydrogen sulphide gas by the rotting of fish at the Protein Products plant under condi-

tions that prevailed on August 11, 1968, is imputed to Consolidated Machines, Inc. and limitation is denied. Limitation must be denied on the additional ground that the vessel was docked at her home dock and her owner, therefore, had the means of knowledge of the facts which caused the deaths and personal injuries here involved.

3. The cargo hold of the F/V NOVELTY in which the five claimants' decedents died and Finley and Parrish suffered personal injury was unseaworthy at the time of the disaster by reason of the fact that it contained hydrogen sulphide gas in rapidly lethal quantities, the inhalation of which by claimants' decedents and the personal injury claimants caused the deaths and injuries complained of. These deaths and injuries were suffered as a result of an unseaworthy condition of the hold of said vessel. This unseaworthy condition was caused by the activation of unseaworthy equipment, i. e., an unseaworthy recirculation hose attached to the vessel by Protein Products. Since the duty to furnish a seaworthy vessel is absolute and nondelegable, Consolidated Machines, Inc. is liable for the ensuing unseaworthy condition of the hold of the F/V NOVELTY.

4. Petitioner, Consolidated Machines, Inc., is liable for failing to use due care in the design and in the supervision of the construction of the production line at the Protein Products plant which proximately contributed to the deaths and personal injuries complained of.

5. Protein Products Corporation is guilty of failure to use due care in the construction and operation of its plant and of the failure to warn claimants of the condition prevailing on August 11, 1968, which failure to use due care resulted in the deaths and personal injuries complained of.

6. Consolidated Machines, Inc. and Protein Products Corporation violated the provisions of Section 1504.93(c)(d) and (e), United States Department of Labor, Safety and Health Regulations for Longshoring, and have failed to carry their burden of

proof that such violation not only did not but could not have caused the deaths and personal injuries complained of.

■ 7. Protein Products Corporation warranted to petitioner Consolidated Machines, Inc. that it would perform its services in a workmanlike manner in unloading the F/V NOVELTY and breached this warranty and shall indemnify Consolidated Machines, Inc. for the damages resulting to Consolidated Machines, Inc. from the deaths of the four employees of Protein Products Corporation and from the injuries sustained by the surviving employee of Protein Products Corporation and for Consolidated Machines, Inc.'s attorney's fees and expenses resulting from the defense of said claims.

■ 8. Petitioner Consolidated Machines, Inc. and Protein Products Corporation are jointly and severally liable for the damages resulting from the death of crewman Stephen Richmond of the F/V NOVELTY and for the damages sustained by Clyde Parrish, the surviving crewman of the F/V NOVELTY. The damages resulting from the death of crewman Stephen Richmond and from the injuries sustained by crewman Clyde Parrish shall be borne equally by Consolidated Machines, Inc. and Protein Products Corporation as between Consolidated and Protein Products.

KRENTZMAN, District Judge.

## BACKGROUND

This case is before the Court in a petition for limitation of or exoneration from liability filed by Consolidated Machines, Inc. Seven persons, i. e., James C. Johnston, as personal representative of five estates, those of Joseph K. Winter, Francis L. Winter, Francis Webb, Kenneth Smith and Stephen Richmond, on behalf of the beneficiaries of such decedents, and Lawrence Finley and Clyde Parrish, the latter two of whom claim personal injuries as a result of a marine casualty, filed claims in the limitation proceeding. Damages for death are claimed on behalf of the beneficiaries of the decedents, under the Jones Act and under general maritime law for Stephen Richmond, and under the general maritime law for negligence and unseaworthiness on behalf of the other decedents. Damages for personal injuries are claimed by Parrish under the Jones Act and general maritime law, and by Finley under the general maritime law for both negligence and unseaworthiness.

Judge Joseph P. Willson, Senior Judge of the Western District of Pennsylvania, sitting by assignment on this Court, entered his amended findings of fact and conclusions of law on the liability questions.

Judge Willson found for the claimants on the liability issues and determination of the damage issues was, by agreement of the parties, reserved for trial to this Court. Such trial was concluded in August 1972. At that time, as a result of the decision in *Moragne v. States Marine Lines*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), there were more questions than answers concerning the measure and extent of compensable elements of damage.

Claimants for those who died sought almost every element of damage that has been found compensable in a wrongful death action, whether maritime or non-maritime, pecuniary or nonpecuniary. The issues are complex and resolution thereof of importance to the parties. Counsel requested and were given opportunity to submit supplemental memoranda of law.

*Moragne, supra,* overruling *The Harrisburg*, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886), held that an action for wrongful death based on unseaworthiness is maintainable under federal maritime law, but left the shaping of the new non-statutory action to future cases.

Attempts so to do have been valiant, and helpful in this and other circuits.

Intervening decisions of the district courts and the Fifth Circuit Court of Appeals in the development, change and rechange on questions of allowable damages and methods of computation thereof, and the resulting supplemental memoranda of the parties, while of assistance to the Court,

necessarily delayed the issuance of these findings. Court congestion and the intruding necessity of court attention to an escalating criminal docket contributed thereto. To date, these issues have been too long undecided.

The Court has before it Judge Willson's findings on liability as to the cause and circumstances of this marine casualty. Among them were these:

"17. On the morning of August 11, 1968, employees of the Protein Products plant and some of the crew members of the fishing vessel NOVELTY, which had come to the plant with a catch of minnows for discharge at the plant, prepared to unload the vessel. Two of the plant employees were in the hold of the vessel preparing to push the fish cargo toward the stand pipe for pumping out of the vessel. Within seconds after the pumps were started and water was run into the hold from the 6 inch line, previously described, these two employees fell over onto the mass of fish. A great deal of excitement ensued and in the attempt to rescue these two men, four other employees of either the vessel or the plant fell into the hold. One, Lawrence Finley, was rescued by means of a hook which was used to pull him out. The five decedents died in the hold. One of the decedents, Stephen Richmond, leaned over the hold to see what was going on and was overcome by the gas coming from the hold and fell into the hold on top of the other employees. Two of the employees, including the vessel's cook, Clyde Parrish, got a whiff of the gas coming from the hold and fell backward on the deck. These two employees survived." (Finding # 17)

"18. The cause of the death of claimants' decedents and the injuries suffered by Parrish and Finley was the injection into the vessel's cargo hold of lethal quantities of hydrogen sulphide gas . . . '(Hydrogen sulphide gas kills human beings by paralyzing the central nervous system. It is breathed through the nose and the first nerve that is para-lyzed is the olfactory nerve so that the higher the concentration, the less likely that the victim will smell the gas and have any warning.)' ". (Finding # 18)

"1. On August 11, 1968, Stephen Richmond was an assistant engineer, a member of the crew of the fishing vessel NOVELTY, and Clyde Parrish was a cook, a member of the crew of the same vessel. Joseph K. Winter, Francis L. Winter, Kenneth Smith, Francis Webb and Lawrence Finley were employees of Protein Products Corporation and at the time in question in this case were engaged in the capacity of longshoremen unloading a cargo of fish from the F/V NOVELTY. (Finding # 1)

The Court and counsel in this case have noted and considered almost sequentially the following: *Dennis v. Central Gulf S. S. Corp.*, 323 F.Supp. 943 (E.D.La.1971) Aff'd. 453 F.2d 137 (5th Cir. 1972); *In Re Sincere Navigation Corporation*, (E.D.La.1969) 295 F.Supp. 610 (1970), 317 F.Supp. 1 (La.1971), 327 F.Supp. 1024 (La.1971), 329 F.Supp. 652, 529 F.2d 744 (5th Cir. 1976); *In Re Farrel Lines*, 339 F.Supp. 91 (E.D.La.1971); *Gaudet, Admx. v. Sea-Land Services*, 463 F.2d 1331 (5th Cir. 1972) Aff'd. 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974).

The *Gaudet* decision in the Supreme Court appeared to settle most of the questions of the law, but in the meantime an ancillary question as to whether or not a trier of the facts should take into account future inflationary or deflationary trends in computing future lost earnings appeared. See: *Johnson v. Penrod Drilling Co.*, 469 F.2d 897, 906 (5th Cir. 1972) Reh. grntd. en banc 478 F.2d 1208 (5th Cir. 1973), 510 F.2d 234 (5th Cir. en banc 1975); *Canal Barge Co., Inc. v. Griffith*, 480 F.2d 11, 28, Note 116 (5th Cir. 1973), 480 F.2d 11, 34 denying petition for rehearing but staying issuance of mandate (5th Cir. 1973), 513 F.2d 911, 912 petition for rehearing granted, stay of mandate vacated. (5th Cir. 1975). The apparent answer to that question in this circuit at this date is that inflationary trends should not be taken into consideration. *In*

*Re Complaint of S/S Helena,* 529 F.2d 744. (5th Cir. 1976).

This Court has received evidence, heard argument of counsel and considered memoranda and supplemental memoranda as to the damage issues and being advised finds and concludes as follows:

1. The general maritime law, as explicated in *Moragne,* governs this case. *In Re: Complaint of S/S Helena, supra.* Under that case and other applicable cases of the Fifth Circuit Court of Appeals, the appropriate persons or entity may recover where applicable and merited in the case for the following elements of damage:

(A) For those who died:

(1) Reasonable funeral expense;

(2) Conscious pain and suffering before death;

(3) Loss of future earnings;

(4) Loss of society; and

(5) Loss of services.

(B) For those who survived:

(1) Past and future medical expenses;

(2) Past and future conscious pain and suffering; and

(3) Past and future loss of earnings.

The Court finds that said Joseph C. Johnston, as personal representative, is the appropriate person to recover for all beneficiaries of each of said decedents.

2. The term "society" embraces a broad range of mutual benefits each family member receives from the other's continued existence, including love, affection, care, attention, companionship, comfort and protection. To preclude double recovery, recovery of loss of consortium includes loss of society. See *Gaudet,* 414 U.S. at 585 and at 589, 94 S.Ct. 806. Thus, a widow, parent, brother, sister, or child may be compensated for loss of society as so defined.

3. Under the general maritime law, damages are not recoverable for grief of the family for loss of a loved one. It is distinguishable from mental anguish and loss of society. *Gaudet,* N. 17 at 585, 94 S.Ct. 806.

4. In determining the extent of loss of future earnings the Court should consider decedent's actual earnings at time of death, his work habits and his prospects for advancement. Possible future inflationary or deflationary trends should not be considered. Earnings should be projected over the decedent's work life expectancy, which would normally be age 65, but as to certain persons and certain occupations might be longer. If projection of earnings, as such, terminates at age 65, amounts shown by the evidence to be normally expected thereafter, such as social security benefits, should be added. Since portions thereof which would have been spent for decedent's personal use would not have been available to survivors, a percentage for that purpose, computed after consideration of the habits and practices of the decedent during his lifetime, should be deducted from the gross amount determined. Where yearly estimated earnings are not clearly above the reach of the middle income scale, no deduction should be made for state or federal income taxes. While determination as to loss of future earnings must be based on the evidence and should not be speculative, it is clear that the trier of the facts, in this case, the Court, must make judgment decisions and that such determination cannot be made with complete mathematical precision.

5. The net loss of future earnings should be apportioned among the dependent survivors of each of the decedents as loss of contributions and support on the basis of the evidence as to need, practice and entitlement.

6. The loss of the personal services of a decedent to and for his family, such as required maintenance to the home, managing the financial affairs, etc. are compensable, if sustained. The actual value thereof should be computed for the reasonable life expectancy of the decedent.

7. Certain of the plaintiffs seek awards for a decedent's loss of future expectation of life and for loss of expected inheritance. The first is not a recoverable

damage and I find that in this case as to each decedent an award for the second would be too speculative and for that and other reasons, are not merited and will not be made.

8. Post award pecuniary damages should be discounted or reduced to present value. The reduction factor is to be determined by the Court from all the available evidence. I find that under the economic issues governing this case, a discount rate of 5 percent is proper. In this case the date of death was August 11, 1968. The date of award will be considered to be August 11, 1972.

9. Prejudgment interest is discretionary with the Court for these claims. In order to compensate the parties fairly and justly the Court will allow prejudgment interest on these claims from the date of award, August 11, 1972, at the straight rate of 6 percent.

10. At the time water was run into the hold of the vessel from the 6 inch line Francis Webb was in the hold among the fish, and Kenneth Smith was either on the ladder on the way down from the deck into the hold, or on the floor of the hold near the ladder. Mr. Webb fell almost immediately and made almost no conscious movement thereafter. Mr. Smith attempted to climb the ladder and say something but fell off the ladder; neither man survived. As Judge Willson found, "A great deal of excitement ensued", in attempts to rescue Messrs. Webb and Smith.

As might be expected, under the circumstances, the testimony of the eye witnesses to the tragedy is neither clear or always consistent.

11. From the evidence the Court concludes that Stephen Richmond, Francis L. Winter, Joseph K. Winter and Lawrence Finley either jumped or fell into the hold. Mr. Finley was rescued in an unconscious condition and survived; the other three died. Clyde Parrish looked into the hold and fell backward on the deck; he survived and with Mr. Finley claims damages personally.

12. Conscious pain and suffering before death is a compensable element of damage in this case if proved. Considerable testimony of expert witnesses was received as to the cause and circumstances of the death of the five men who did not survive. In my opinion each of them, except Kenneth Smith, lost consciousness immediately and experienced no pain, fright, fear of impending death or suffering. Kenneth Smith was in or on the way into the hold when the water containing the toxic gas was first sprayed into the hold. His actions thereafter indicate that he was conscious, and I find that he did suffer conscious mental and physical pain, fright and fear of impending death.

13. Joseph K. Winter and Francis L. Winter were brothers, they and some of the other victims of the tragedy on the F/V NOVELTY had previously worked together and were acquainted. Some of the survivors reside in the same part of the country and are acquainted. Determination of damages requires consideration of each separate family unit; people, their talents, needs and personalities are different. No attempt has been made to compare the needs of one family with the others in fixing damages.

14. *Re: Joseph K. Winter*

(A) Joseph K. Winter was born December 30, 1912. On August 11, 1968 he was 55 years old and had a life expectancy of 19 and ½ years. Ruth Norma Winter, whom he married in 1958, survived him. She was 44 years old in 1968, and had a longer life expectancy than he did. Each of them had two children by former marriages who were adults and not dependent in 1968. Joseph and Ruth had a son, Laddie David Winter, who was 12 years old at the time of his father's death. Both the wife and child were dependent upon Mr. Winter for support.

(B) The funeral expense for Joseph was $1,906.71.

(C) As I have indicated, Joseph died without conscious pain or suffering.

(D) The relationship between Joseph and Ruth began prior to 1958, and they shared a mutual interest in Laddie and each other. The value of the loss by a widow of the society of her husband must be determined in accordance with all the facts and circumstances of the case. I find that $2,500 per year over the period of 25 years is reasonable compensation for such loss. The total awarded therefor is $62,500. Such amount does not have to be reduced to present value.

(E) Mr. Winter spent a great deal of time with Laddie. In Texas Mr. Winter bought several horses and Laddie was taught how to work with and care for them. Laddie often accompanied his father to the places where he worked and on the day of the tragedy Laddie was at the fish meal plant. From the evidence I find, Mr. Winter was a good parent and did furnish training and guidance to the boy. The record does not establish the likelihood that Laddie would benefit from college training, but without question, the boy did suffer a loss of nurture from his father's death. I find that reasonable compensation therefor during Laddie's minority is the sum of $25,000.

(F) I likewise find that Laddie suffered the loss of the existing and future love, affection and companionship of his father during his minority and award to him the sum of $25,000 for that loss.

(G) Joseph K. Winter had worked as a fisherman or in fish meal plants practically all of his life. He originally worked in the Louisiana, Texas and Florida areas. He was mechanically inclined and had a reputation as a trouble shooter who could repair or "fix" most mechanical devices. His annual income for the year 1968, based on the amount he earned during the part of the year he worked, projected to the sum of $8,264. He had, however, been promoted to plant manager or foreman at the time of his death and been in supervisory positions in other fish meal plants in prior years. At the time of his death he was earning a salary which converted to an annual basis of $10,400, and I find that thereafter he would have earned not less than that amount annually until age 65. After age 65 he would have received Social Security benefits during his normal life expectancy. Thus, his gross income from August 11, 1968 until age 65 on December 30, 1977 would have been $97,500. Mr. Schulenberger, an expert presented by Defendant Consolidated Machines, testified that the lost Social Security benefits were $23,905, making a total of $121,405. Of this, $41,600 had accrued by the date of award. The balance of $79,805, discounted to date of award, is $45,925.32, making a total wage loss of $87,-525.30. This sum should be reduced by 20% which I find to be a fair percentage of total income which would have been spent by Mr. Winter for personal living expenses. Thus reduced the net loss of earnings to the family is $70,020.24.

(H) Mr. Winter handled the home finances, he thawed the pipes when they froze in Rhode Island, repaired the cars and television, and painted and made house repairs. I find that Mrs. Winter should receive $30 per month for the loss of his services about the house over his life expectancy of nearly 20 years. Of this, $1,425 had accrued as of the date of the award. The balance of $5,775, discounted to August 11, 1972, is $2,711.71.

(I) Assuming that Laddie would remain with his mother until age 18 and that $150 per month would be required for his maintenance, I find that the $70,020.24 award for loss of earnings should be apportioned $10,800 to or for his benefit and the remainder of $59,220.24, to the widow, Ruth Norma Winter.

(J) The awards of $25,000, $25,000 and $10,800, respectively, in the total sum of $60,800 to Laddie David Winter should be distributed to him or for his benefit at the rate of $2,400 a year beginning as of August 11, 1968 through his legal minority, with the balance at majority.

RECAPITULATION OF DAMAGES FROM

DEATH OF JOSEPH K. WINTER

GENERAL DAMAGES

| | | |
|---|---|---|
| Funeral Expense - to estate | $ 1,906.71 | |
| Loss of Society: | | |
|   To widow, Ruth Norma Winter | 62,500.00 | |
|   To son, Laddie David Winter | 25,000.00 | |
| Loss of Nurture | | |
|   To son, Laddie David Winter | 25,000.00 | |
| TOTAL GENERAL DAMAGES | | $114,406.71 |

PECUNIARY DAMAGES

| | | |
|---|---|---|
| Loss of Earnings: | | |
|   To date of award | $ 41,600.00 | |
|   Future loss of earnings, discounted | 45,925.30 | |
| Total Wage Loss | $ 87,525.30 | |
| Less 20%, attributable to decedent's personal use | 17,505.06 | |
| NET LOSS TO FAMILY - | | $ 70,020.24 |

Apportioned:   $10,800 to Laddie David Winter; and

$59,220.24 to Ruth Norma Winter

LOSS OF SERVICES TO THE WIDOW

| | | |
|---|---|---|
| To date | $ 1,425.00 | |
| Future loss, discounted | 2,711.71 | |
| TOTAL LOSS OF SERVICES | | $ 4,136.71 |
| TOTAL PECUNIARY LOSS | | $ 74,156.95 |

| | |
|---|---|
| GENERAL | $114,406.71 |
| PECUNIARY | 74,156.95 |
| TOTAL DAMAGES | $188,563.66 |

### 15. *Re: Francis L. Winter*

(A) Francis L. Winter was born May 29, 1915 and had a life expectancy of 21 years and 89 days at the time of his death on August 11, 1968. He was survived by his wife, Mary Alice Winter, and three children, David Winter, Richard Winter and Stefanie Winter Houde. The children were adults at the time of his death and were not dependent upon him. He was the brother of Joseph K. Winter; their mother survived them, but not the date of the trial and was not dependent upon either.

(B) The funeral expense for Francis L. Winter was $1,885.93.

(C) As I have indicated, I find that Mr. Winter did not experience conscious pain and suffering incidental to his death.

(D) Mary Alice was 52 years old at the time of her husband's death and had a life expectancy of 27 years. She and Francis L. Winter had been married for 31 years and were a happily married couple. They had occupied a rented house for many years where they had reared their children. She had worked in a school lunch room for approximately 18 years and her husband had held two jobs while their son Richard attended college where he graduated. She was described as a person who had always been jolly and outgoing.

The family relationship is described as being warm and close. After her husband's death Mrs. Winter became moody and introspective, her health deteriorated and she had to move out of their home and move to a project apartment. I find that the effect of her husband's death upon Mrs. Winter was traumatic. While financial compensation can never absolve her grief, I find that the sum of $3,000 a year over the period of 25 years is justified for the loss of the society of her husband.

(E) Francis L. Winter had versatile vocational abilities. When he first met his wife he was a carpenter and painter. For the most part he was a fisherman off the Rhode Island coast where he caught cod and other fish by the use of nets. While his son was in college he worked as a rigger at the Electric Boat Company in Groton, Connecticut. After his son's graduation he went back to fishing. At times he held two jobs to ease the financial burden of college expense. He had been working at the fish meal plant about two months prior to his death, and he had not previously done such work. Because of inclusion of his wife's income of about $2,000 per year in his tax returns, there was some confusion about his annual income, but from the evidence I find that he was earning $10,800 a year and that thereafter he would have earned not less than that amount annually until age 65. After that he would have received Social Security benefits for life. Thus, from August 11, 1968 to age 65 on May 29, 1980, his future income would be $127,350. Again, from the testimony of defendant's expert, Mr. Schulenberg, his benefits from Social Security would have been $23,544 making a total of $150,894. Of this $43,200 had accrued to date of award. The balance of $107,694 discounted to date of award is $46,428, making a total wage loss of $89,-628. During the many years he fished Mr. Winter followed the practice of turning his checks from sale of "fin" fish over to Mrs. Winter. Apparently the proceeds from the sale of lobsters which he caught incidentally, called "shack money", were retained by him for his personal expenses. Because of this habit and that of reading and living a quiet life I find that only about 15% of the total income would have been spent by him or for him for personal living expenses. Reduced by this percentage the net loss of earnings to the widow is $76,184.80.

(F) Mr. Winter was mechanically able. He repaired their cars, fixed the television, repaired small appliances, painted the house and repaired plumbing. These services have value and his absence results in a loss to the widow. I find that the sum of $30 per month for the period of 25 years is reasonable. Of this $1,425 had accrued as of the date of the award. The balance of $7,560, discounted to August 11, 1972 is $2,713.60.

RECAPITULATION OF DAMAGES FROM

DEATH OF FRANCIS L. WINTER

GENERAL DAMAGES

| | | |
|---|---|---|
| Funeral Expense - to estate | $ 1,885.93 | |
| Loss of Society:<br>To widow, Mary Alice Winter | 75,000.00 | |
| TOTAL GENERAL DAMAGES | | $ 76,885.93 |

PECUNIARY DAMAGES

| | | |
|---|---|---|
| Loss of Earnings:<br>To date of award | $ 43,200.00 | |
| Future loss of earnings,<br>discounted | 46,428.00 | |
| Total wage loss | $ 89,628.00 | |
| Less 15% attributable to<br>decedent's personal use | 13,444.20 | |
| NET LOSS - TO WIDOW | | $ 76,184.80 |

LOSS OF SERVICE TO WIDOW

| | | |
|---|---|---|
| To date | 1,425.00 | |
| Future loss, discounted | 2,713.60 | |
| TOTAL LOSS OF SERVICES | • | $ 4,138.60 |
| TOTAL PECUNIARY LOSS | | $ 80,323.40 |

| | |
|---|---|
| GENERAL | $ 76,885.93 |
| PECUNIARY | 80,323.40 |
| TOTAL DAMAGES | $157,209.33 |

16. *Re: Kenneth Smith*

(A) Kenneth Smith was born August 15, 1912, and was 56 years of age on August 11, 1968 with a life expectancy of 18.8 years. Kenneth was not married at the time of his death. He had no children. His former wife left him many years ago. He formerly operated a small gas station in Orlando. He liked the water and fishing and moved from one place to another. At the time of his death he was working at the fish meal plant and was earning an average of about $2,800 per year. Surviving him on the date of trial was Clinton W. Smith who was 80 years old on August 11, 1968 with a life expectancy of 8.1 years. Also surviving were five brothers and sisters, three others predeceased Kenneth Smith. Kenneth did not contribute to the support of his father or any other relative and none were de-

pendent upon him. His sister, Helen Moody, a supervising operator for the telephone company in Pittsburgh, Pennsylvania, testified she talked with Kenneth by telephone about twice a month and relayed to their father news of his welfare. She said the father was always glad to hear about Kenneth whom he had not seen since the time of Kenneth's mother's death in 1966.

(B) The funeral expense for Kenneth Smith was $1,380.89.

■ (C) As I have indicated, I find from the evidence Kenneth Smith did experience conscious pain and suffering immediately prior to his death. In my opinion an award of $25,000 general damages to his estate is justified.

(D) I find no basis for or make an award for loss of support or loss of services.

■ (E) While there is no suggestion of lack of affection for Kenneth by his brothers and sisters, and Mrs. Moody did show a commendable interest in him, and probably more interest in her father, I find no basis for an award to them for the loss of Kenneth's society. While the age of both the father and Kenneth together with the separation of distance tend to reduce the severity thereof, I recognize a loss to the father and award the sum of $8,000 to him for the loss of his son's society.

RECAPITUATION OF DAMAGES FROM THE

DEATH OF KENNETH SMITH

GENERAL DAMAGES

| | |
|---|---|
| Funeral expense to estate | $ 1,380.89 |
| Award for conscious pain and suffering, to estate | 25,000.00 |
| Loss of society, To father, Clinton W. Smith | 8,000.00 |
| TOTAL GENERAL DAMAGES | $ 34,380.89 |

17. *Re: Stephen Richmond*

(A) Stephen Richmond was born June 3, 1950, was 18 on August 11, 1968, and had a life expectancy of 52.1 years. He is survived by his mother, Annie Irene Richmond, who was 48 at the time of his death and had a life expectancy of 30 years.

(B) The funeral expense for Stephen Richmond was $1,748.65.

(C) As I have indicated, I find that Stephen Richmond did not experience conscious pain and suffering incidental to his death.

■ (D) Stephen Richmond was an average student. His mother testified that he read a great deal and had a high intelligent quotient. While he was in school he had various jobs including one for a short while at a fish meal plant in Rhode Island. He was distantly related to the Winter family and through information from them he came to Florida in April or May 1968 where he worked at the fish meal plant until his death in August. His average annual wage for the year 1968 was $4,680. Mrs. Annie Richmond had worked for the General Electric Company for 29 years where she packed extension cords. At the time of the trial she had been on sick leave since November 1967. She went on leave with a kidney stone then found that she had osteomyelitis of the spine. She was awaiting a company decision as to whether she would be placed in a job involving lighter work or would be

retired with a pension. During her illness she had first drawn disability insurance and more recently had been receiving state welfare in the form of aid for dependent children. Her household consisted of her 75 year old mother, who received a small Social Security check, and a 16 year old son, Joel. During his lifetime Stephen had always given his mother a part of his earnings. While in Florida, after repaying the Winter's family for the amount they advanced for his airplane ticket and paying his initial expenses, Stephen sent his mother $30 of his wages. At the time of his death his employer paid $180 for his last two weeks work. There is evidence justifying the conclusion that he would have contributed to the support of his mother for the period of her life. It is not reasonable to believe that for the remainder of his life he would have made only $90 a week; it is likewise not reasonable to believe that his personal needs would have remained constant, considering the possibility of his acquiring other dependents. Under all the circumstances, I am of the opinion that he would have contributed at least the sum of $50 per month. That amount computed for 30 years amounts to the sum of $18,000, commuted to August 11, 1972 is the sum of $5,062.32 which I find to be reasonable compensation to Annie Irene Richmond for loss of contribution from his earnings.

(E) While there is evidence that Stephen performed services having value around the home while he was there, he was not so doing at the time of his death and probably would not have resided at or performed services thereat.

(F) The relationship between Stephen and his mother was a good one. Her health was detrimentally affected by his death. I find that she suffered from the loss of his society and fix the sum of $25,000 as compensation therefor.

RECAPITULATION OF DAMAGES FROM

DEATH OF STEPHEN RICHMOND

GENERAL DAMAGES

    Funeral expense to estate       $  1,748.65

    Loss of society –
      To mother, Annie Irene Richmond   25,000.00

    TOTAL GENERAL DAMAGES      $ 26,748.65

PECUNIARY DAMAGES

    Loss of contribution from
     earnings
    Net amount, $18,000 – commuted   $  5,062.32

| | |
|---|---|
| GENERAL DAMAGES | $26,748.65 |
| PECUNIARY DAMAGES | 5,062.32 |
| TOTAL | $31,810.97 |

18. *Re: Francis D. Webb*

(A) Francis D. Webb was born September 20, 1944 and was 23 years of age on August 11, 1968, with a life expectancy of 43.8 years. Francis Webb was not married. He was engaged to marry Linda Pitcher and the marriage was to have taken place on August 25, 1968. He was survived by his mother, Laura A. Webb, age 47, with a life expectancy of 31.4 years, his father, George R. Webb, age 51, with a life expectancy of 22.7 years, and a younger sister, Germaine.

(B) The funeral expense for Francis D. Webb was $1,986.65.

(C) As I have indicated, I find that Francis D. Webb did not experience conscious pain and suffering incidental to his death.

(D) Francis graduated from high school where he made average grades in 1963. Thereafter he was a fisherman in the Rhode Island area and boarded with his parents. In 1967 he attended a pilot training school in Minden, Nevada for about an eight month course. He graduated as an airplane pilot in 1968 and had been in Florida for about five months where he served as a "spotter" for the M/V Novelty. From his airplane he located schools of menhaden or other small fish which the "Novelty" harvested for conversion to fish meal. His annual rate of income based on his 1968 earnings was $7,935. While a fisherman and later as a pilot Francis supported himself and made gifts to his sister and mother. He is described as having been generous. His parents made loans for pilot school and other purposes between two to five thousand dollars. He had drawn practically all of his savings in the sum of $800 shortly prior to his death and had reported to his parents that he was "all set" financially for his upcoming marriage. Almost no money was found among his effects in Florida and it must be assumed that he either had spent his money or that scavengers had stolen his money after his death and before inventory of his assets. Without question Francis would have earned money during his lifetime. Under the circumstances, he left no one dependent upon him and no one is entitled to recover for loss of earnings.

(E) I find no legal basis for Linda to recover for the loss of Francis' society. Hopefully, her youth and the passage of time have ameliorated her loss. Francis was close to his parents and sister. He lived with them between 1963 and 1967; he helped his sister occasionally with financial problems. His parents helped him financially and he kept in touch with them while he was in Florida. They kept his dog and had it at the time of the trial. He seemed to be sensitive to the beauty of nature and shared this with his mother. For the loss of his society, as defined in *Gaudet, supra,* I award $25,000 to his mother, Laura A. Webb, and $5,000 each to his father, George R. Webb, and his sister, Germaine Webb.

RECAPITULATION OF DAMAGES FROM

DEATH OF FRANCIS D. WEBB

| | |
|---|---|
| GENERAL DAMAGES | |
| Funeral expense – to estate | $ 1,986.65 |
| Loss of Society | |
| To Laura A. Webb | 25,000.00 |
| To George R. Webb | 5,000.00 |
| To Germaine Webb | 5,000.00 |
| TOTAL | $ 36,986.65 |
| PECUNIARY DAMAGES – None | |

18. *Re: Clyde Parrish*

(A) Clyde Parrish was born July 26, 1912 and was 56 years of age on August 11, 1968. Although Mr. Parrish had been married three times he was unmarried on August 11, 1968. He had two grown daughters and was living with one of them at the time of trial. Mr. Parrish had an eighth grade education and had worked as a truck driver for a construction company, a labor foreman, operated a bulldozer, assisted in operating a fish camp, worked in the bee business, and was a commercial fisherman earning about $60 a week.

(B) He began work on the Novelty in May, 1968 and on August 11 he was the cook earning $75 a week. On that day, shortly after breakfast, he was in the galley, heard some one "holler" and went out on the deck where he looked over into the hold. He said that he was then "knocked out, just like that". He fell over backward and when he came to he was laying on the deck and Finley was there beside him, still unconscious. The captain told him to take care of Finley and he did, giving him mouth to mouth resuscitation and assisted in taking him to the nearest hospital where he carried Finley, still in an unconscious condition, into the hospital over his shoulders. Mr. Parrish did not get any treatment at that time although he said his head was aching, his eyes were burning, and he had "shortness of breath". He said that one of the company officers told the captain to take him to the hospital for treatment and that they made an appointment but left that night for Key West and then to Fernandina on the vessel. About two weeks after the accident he left the ship because of his health and went to Quincy, Florida to see Dr. Reddick who was his family doctor.

Mr. Parrish has not worked since he left Fernandina, claims to be permanently disabled with impaired vision, trouble with memory, shortness of breath, numbness in his leg, inability to sleep and recurring headaches. Concerning Mr. Parrish the Court heard the testimony of Dr. Reddick, an M. D., qualified both as a general practitioner and a surgeon; Dr. Anthony J. Spo-to, an M.D., qualified in the treatment of the eye, ear, nose and throat; Dr. Anthony Perzia, an ophthalmologist; Dr. Raymond J. Sever, an ophthalmologist, specializing in diseases of the retina; and Dr. Robert C. Aliff, a neurological surgeon.

Determination as to the effect of the accident on Mr. Parrish is complicated by his preexisting health problems. By August 11, 1968 he had led an active and eventful life. In 1932 his left forearm was amputated after a gun accident and later he received a rattlesnake bite on his leg while hunting. He smoked regularly, had high blood pressure, a coronary disease, bronchitis, emphysema, and a liver dysfunction. In spite of this he led an active life, hunting and fishing, driving a car and operating a bulldozer.

Mr. Parrish did not consult with Dr. Reddick until March 12, 1969, and suggestion is made that this is an indication that he was not then suffering as claimed. This position is rejected; I find the delay to be consistent with the evidence as to the events immediately following August 11 and the education and experience of Mr. Parrish. I find the testimony of Dr. Reddick to be candid and believable. He was well informed about the possible effects of hydrogen sulfide poisoning, had been treating Mr. Parrish for more than twenty years, and was well aware of his medical problems existing prior to August 11, 1968. Between that date and the date of trial he had examined or treated Mr. Parrish more than fourteen times. He found that as a result of the exposure to the hydrogen sulfide gas, Mr. Parrish's central nervous system had been affected, causing poor cerebration, headache and dizziness. In addition, he found it to have resulted in optic neuritis and neuritis of the left leg, and to have detrimentally affected Mr. Parrish's existing bronchitis and emphysema. He found these disabilities to be permanent, and in his opinion Mr. Parrish was 50% disabled prior to the accident and totally disabled thereafter.

Dr. Reddick testified that in his opinion Mr. Parrish would live 15 years after 1972,

"if he was lucky" and that he would have future medical expense as a result of the accident of $100 a year.

█ In spite of his medical and physical disabilities Mr. Parrish was effectively serving as cook on the Novelty prior to the accident. He testified that this involved purchasing supplies and planning and serving the meals. I find that as a result of the accident he was and is unable to work or enjoy his previous vocational and recreational activities. He was 56 years of age on August 11, 1968 with a work expectation until age 65 of nine years. In my opinion he suffered a loss of earnings of $35,100 of which $15,600 had accrued on August 11, 1972 with a commuted balance of $13,903.30.

(C) Mr. Parrish is entitled to compensation for reimbursement of past and future medical expense resulting from the accident. I find the accrued expense to be $500, and future expense at $100 a year for 15 years commuted to be $721.53.

█ (D) Mr. Parrish has and will have pain and suffering as a result of the accident. From the evidence I find reasonable compensation therefor to be $67,000.

RECAPITULATION OF DAMAGES

RE: CLYDE PARRISH

GENERAL DAMAGES:

    Past and present pain and suffering                         $67,000.00

PECUNIARY DAMAGES:

    Loss of Earnings:

| | | |
|---|---|---|
| Accrued | $ 15,600.00 | |
| Future, reduced | 13,903.30 | |
| TOTAL LOSS OF EARNINGS | | 29,503.30 |

    Medical Expense:

| | | |
|---|---|---|
| Accrued | $ 500.00 | |
| Future, reduced | 721.53 | |
| TOTAL MEDICAL EXPENSE | | 1,221.53 |

    TOTAL PECUNIARY DAMAGES             $ 30,724.83

| | |
|---|---|
| GENERAL DAMAGES | $ 67,000.00 |
| PECUNIARY DAMAGES | 30,724.83 |
| TOTAL DAMAGES | $ 97,724.83 |

## 19. Re: Lawrence T. Finley

(A) Lawrence T. Finley was 37 years old in 1972 and about 33 on August 11, 1968. He had been employed by Protein Products Co. for about a month and a half as a maintenance man at the fish meal plant where he helped repair equipment and move fish from the hold of the Novelty to the processing plant. On the day of the accident he was on the deck holding the hose through which water was forced under pressure into the hold where it was used to "break up" the concentration of fish. Eventually the "slush" of fish and water would be sucked up through the hose and into the plant. He testified that he turned the valve starting the water and turned his head away from the hold for a second. When he looked back into the hold he saw "Webby", Francis Webb, lying among the fish and the end of the hose swinging back and forth in the hold. Mr. Finley thought that the nozzle of the hose, under pressure, had hit Mr. Webb. He yelled "shut off the water" and went over the side and down into the hold; he said that he didn't remember anything after that until he woke up in the hospital. Douglas Bellamy, an employee, who was on the deck and a witness to the tragedy, testified that he and one other "hooked . . Mr. Finley . . in the belt" and pulled him out. Mr. Parrish aided Mr. Finley and took him to the hospital in an unconscious condition, as previously noted. Mr. Finley testified that when he "woke up" he was in the hospital, strapped down in bed with a pain in his head and with burning eyes, and that he could not see. Dr. Wallace M. Groves, Jr., a pathologist who examined Mr. Finley and took a blood sample for analysis, testified that he was in a coma for a day or two, that his lungs were congested with much fluid, that he had severe conjunctivitis, with pink eyes and that the blood analysis showed the presence of sulfhemoglobin. It was his opinion that all of this was consistent with hydrogen sulfide poisoning. Mr. Finley was in the hospital for two or three days; thereafter he went out again to sea on the vessel, he said, in the hope the fresh air would help him. After two weeks he left the ship at Fernandina to go home to North Port Charlotte, Florida. He said that he was and is still suffering from headaches and shortness of breath and that for about a year after the accident he couldn't keep a job because of his health. Eventually he moved back to Long Island, New York and at the time of the trial he was a clam fisherman.

(B) Mr. Finley was making between $80 and $90 a week at the time of the accident and his prior employment history indicated his ability to earn at least that amount. Although he had some interim employment, I find that he was substantially unable to work as a result of his injuries for a year after the accident, and thus had a loss of earnings of $4,420 which amount had accrued by the award date.

(C) Mr. Finley had pain and suffering as a result of the accident. I find an award of $5,000 to be reasonable for such damage suffered between 1968 and 1972. The evidence indicates that as of 1972 he had a life expectancy of about 32 years. He continues to have severe headaches and there are indications of partial permanent damage to his central nervous system. I find an award of $11,520 for future pain and suffering to be justified.

```
          RECAPITULATION OF DAMAGES
          RE:  LAWRENCE T. FINLEY

GENERAL DAMAGES:
    Pain and suffering           $16,520.00
PECUNIARY DAMAGES:
    Loss of earnings,
      accrued by date of award      4,420.00

    TOTAL DAMAGES                 $20,940.00
```

20. The Court expresses appreciation to counsel for their respective effective advocacy.

21. Claimants may have their costs which shall be settled in accordance with the Rules.

22. Post-judgment interest should be, and is allowed at the rate of 6% per annum.

23. Counsel for respective claimants should submit judgments in accord herewith.

## FINAL JUDGMENT FOR INDEMNITY

In accordance with the Court's Findings of Fact and Conclusions of Law of March 27, 1972, and Amended Findings of Fact and Conclusions of Law of March 30, 1972, it is

ORDERED AND ADJUDGED that Third Party Plaintiff Consolidated Machines, Inc. recover of Third Party Defendant Protein Products Corporation indemnity in the amounts recovered from Consolidated Machines for the deaths of Joseph K. Winter, Francis L. Winter, Kenneth Smith and Francis Webb and the injuries sustained by Lawrence Finley and the reasonable attorneys' fees and costs of defense for those claims with legal rate of interest as provided by law and its costs of action. If Third Party Plaintiff and Third Party Defendant cannot agree upon the attorneys' fees and defense costs which Third Party Plaintiff is entitled to recover by way of indemnity, the Court will make further findings of fact and a supplemental judgment upon motion by either party.

## FINAL JUDGMENT

This action came on for hearing before the Court, Honorable Joseph P. Willson, Senior Judge of the Western District of Pennsylvania, presiding by assignment to this court, on a Petition for Limitation of or Exoneration from Liability filed by Consolidated Machines, Inc. as owner of the fishing vessel NOVELTY. Seven persons, i.e., James C. Johnston, as personal representative of five estates, those of Joseph K. Winter, Francis L. Winter, Francis Webb, Kenneth Smith, and Stephen Richmond, on behalf of the beneficiaries of such decedents, and Lawrence Finley and Clyde Parrish, the latter two of whom claim personal injuries as a result of a marine casualty, filed claims in the limitation proceeding. The claims for damages were based on the Jones Act and General Maritime Law. The Petitioner and Third Party Plaintiff, Consolidated Machines, Inc., sought indemnification from Protein Products Corporation as Third Party Defendant. The parties agreed, and the Court ruled that the issues for determination of the first phase of this case were to be limited to the liability issues, and that the damages if any, would be determined in a later proceeding to be set by the Court. Judge Joseph P. Willson found for the claimants holding Petitioner, Consolidated Machines, Inc., liable for the damages sustained by reason of the deaths of Joseph K. Winter, Francis L. Winter, Kenneth Smith and Francis Webb and the injuries of Lawrence Finley and holding Petitioners, Consolidated Machines, Inc., and Third Party Defendant Protein Products Corporation, jointly, severally and equally liable for the damages sustained by reason of the death of Stephen Richmond and the injuries of Clyde Parrish, and duly entered his Amended Findings of Fact and Conclusions of Law on March 30, 1972.

The second phase of this action, dealing solely with the issue of damages, came on for hearing before the Court, Honorable Ben Krentzman, District Judge, presiding, and the issues having been duly heard, and a decision having been duly rendered,

It is Ordered and Adjudged that:

Petitioner, Consolidated Machines, Inc. do pay to the claimants hereinafter named the following sums of damages, as well as prejudgment interest running from August 11, 1972 to December 15, 1976 at a straight rate of 6% per annum, with costs to be hereinafter taxed by the Clerk; a summary statement of the amounts to be paid being as follows:

A. That James C. Johnston, as personal representative of the Estate of Joseph K. Winter, shall have and recover from Consol-

idated Machines, Inc., the sum of $237,-822.21, with said sum being hereby apportioned among the persons for whose benefit the claim was brought as follows:

| (1) | The Estate of Joseph K. Winter | $ | 1,906.71 |
| | Prejudgment interest | | 497.08 |
| | Total | $ | 2,403.79 |
| (2) | Ruth Norma Winter | | 125,856.95 |
| | Prejudgment interest | | 32,910.91 |
| | Total | $ | 158,767.86 |
| (3) | Laddie David Winter | | 60,800.00 |
| | Prejudgment interest | | 15,850.56 |
| | Total | $ | 76,650.56 |

B.   That James C. Johnston, as personal representative of the Estate of Francis L. Winter, shall have and recover from Consolidated Machines, Inc., the sum of $198,-193.80, with said sum being hereby apportioned among the persons for whose benefit the claim was brought as follows:

| (1) | The Estate of Francis L. Winter | $ | 1,885.93 |
| | Prejudgment interest | | 491.68 |
| | Total | $ | 2,377.61 |
| (2) | Mary Alice Winter | | 155,323.40 |
| | Prejudgment interest | | 40,492.79 |
| | Total | $ | 195,816.19 |

C.   That James C. Johnston, as personal representative of the Estate of Kenneth Smith, shall have and recover from Consolidated Machines, Inc., the sum of $43,343.98, with said sum being hereby apportioned among the persons for whose benefit the claim was brought as follows:

| (1) | The Estate of Kenneth Smith | $ | 26,380.89 |
| | Prejudmgnet interest | | 6,877.49 |
| | Total | $ | 33,258.38 |
| (2) | Clinton W. Smith | | 8,000.00 |
| | Prejudgment interest | | 2,085.60 |
| | Total | $ | 10,085.60 |

D.   That James C. Johnston, as personal representative of the Estate of Stephen Richmond, shall have and recover from Consolidated Machines, Inc. and Protein Products Corp., or either of them, the sum of $40,103.97, with said sum being hereby apportioned among the persons for whose benefit the claim was brought as follows:

| (1) | The Estate of Stephen Richmond | $ | 1,748.56 |
| | Prejudgment interest | | 455.84 |
| | Total | $ | 2,204.40 |
| (2) | Armie Irene Richmond | | 30,062.32 |
| | Prejudgment interest | | 7,837.25 |
| | Total | $ | 37,899.57 |

E.   That James C. Johnston, as personal representative of the Estate of Francis D. Webb, shall have and recover from Consolidated Machines, Inc., the sum of $46,629.07, with said sum being hereby apportioned among the persons for whose benefit the claim was brought as follows:

| (1) | The Estate of Francis D. Webb | $ | 1,986.65 |
| | Prejudgment interest | | 517.92 |
| | Total | $ | 2,504.57 |
| (2) | Laura A. Webb | | 25,000.00 |
| | Prejudgment interest | | 6,517.50 |
| | Total | $ | 31,517.50 |
| (3) | George R. Webb | | 5,000.00 |
| | Prejudgment interest | | 1,303.50 |
| | Total | $ | 6,303.50 |
| (4) | Germaine Webb | | 5,000.00 |
| | Prejudgment interest | | 1,303.50 |
| | Total | $ | 6,303.50 |

F.   That Clyde Parrish, shall have and recover from Consolidated Machines, Inc. and Protein Products Corp., or either of them, the sum of $123,201.69, said sum being the total of $97,724.83 in awarded damages, together with $25,476.86 in prejudgment interest.

G.   That Lawrence T. Finley, shall have and recover from Consolidated Machines, Inc., the sum of $26,399.06, said sum being the total of $20,940.00 in awarded damages, together with $5,459.06 in prejudgment interest.

Post judgment interest is allowed at the rate of 6% per annum.

The sums hereby awarded to Joseph K. Winter, Francis L. Winter and Lawrence Finley are subject to compensation liens held by Liberty Mutual Insurance Company under the terms and provisions of the Longshoremen's and Harbor Workers' Compensation Act.